UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| BOB LUNT, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | )     **Case No. 3:22-cv-00775** |
| FROST SHADES FRANCHISING, LLC, | )     **Judge Aleta A. Trauger** |
| LEIBY GOLDBERGER, and CURT | ) |
| SWANSON, | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM

Defendants Frost Shades Franchising, LLC ("Frost Shades"), Leiby Goldberger, and Curt Swanson have filed a Motion to Dismiss and Compel Arbitration or, In the Alternative, Motion to Join an Indispensable Party (Doc. No. 11), to which Bob Lunt has filed a Response (Doc. No. 25), and the defendants have filed a Reply (Doc. No. 26). Lunt has filed a Motion for Preliminary Injunction (Doc. No. 27), to which the defendants have filed a Response (Doc. No. 36), Lunt has filed a Reply (Doc. No. 43) and Supplemental Reply (Doc. No. 42), and the defendants have filed a Response to the Supplemental Reply (Doc. No. 46). For the reasons set out herein, each motion will be granted in part and denied in part.

## I. BACKGROUND

When a party "owns" a trademark, that does not mean that the party has a property interest in the creative aspects of the words or visual elements that make up the mark. Rights like those—that is, creative rights—are covered by copyright, not trademark. Trademark law is concerned, instead, with the commercial goodwill that the mark embodies based on its association with a particular furnisher of goods or services. "Under traditional principles of

trademark law, '[t]here is no such thing as property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed.'" *Yellowbook Inc. v. Brandeberry*, 708 F.3d 837, 844 (6th Cir. 2013) (quoting *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir.1998); citing Mark A. Lemley, The Modern Lanham Act and the Death of Common Sense, 108 Yale L.J. 1687, 1688 (1999)). The commercial value of a trademark—or a cluster of trademarks fashioned into a brand identity— rests primarily in the mark's ability to convey to consumers that the good or service being offered is the product of an actual, existing business toward which consumers have, or could develop, some degree of goodwill.

Making money off of an existing trademark is therefore not as simple as just selling rights to use the mark to the highest bidder, like a musical composition or piece of copyright-protected software. Indeed, that is not even an option, because "[a]ssignment of a trademark without its associated goodwill is treated as an invalid 'assignment in gross' that gives the assignee no rights." *Id.* (citing 15 U.S.C. § 1060; *In re Roman Cleanser Co.*, 802 F.2d 207, 208 (6th Cir. 1986); *Greenlon Inc. of Cincinnati v. Greenlawn, Inc.*, 542 F. Supp. 890, 893 (S.D. Ohio 1982)). Rather, a party that wishes to increase the amount of money it is making off of a trademark has, broadly speaking, three options: it can expand or otherwise improve the existing business with which the trademark is associated, thereby increasing the goodwill embodied by the mark; it can liquidate that goodwill by selling the entire business, trademarks and all, to a buyer; or it can retain ownership of the mark but license limited usage rights to third parties who are contractually bound to honor certain quality-control obligations that would prevent the license from being struck down as an invalid assignment in gross. That third strategy— licensing—can take many forms, one of which is "franchising," the licensing of a brand identity

2

to individual operators to carry out the licensor's preexisting business model as formally distinct, but contractually linked, franchisees. Franchising is common, and many well-known brands are, in fact, not unitary enterprises, but wide-reaching franchise operations.

Franchising, like many industries, provides opportunities for bad actors to take advantage of unsophisticated counterparties—for example, by luring prospective franchisees into paying exorbitant fees to open franchises with little or no chance of actual success. In light of those risks, "[o]n November 11, 1971, the [Federal Trade Commission ('FTC')] announced the initiation of a proceeding for the promulgation of a trade regulation rule relating to disclosure requirements and prohibitions concerning franchising," which ultimately culminated in the final issuance of that agency's "Franchise Rule" several years later. 43 Fed. Reg. 59614, at 59,622. The Franchise Rule "requires franchisors to furnish prospective franchisees with disclosure documents"—commonly known as the company's "FDD"—"at least 14 calendar days before the prospective franchisee signs the franchise agreement." *Arruda v. Curves Int'l, Inc.*, 861 F. App'x 831, 835 (5th Cir. 2021) (citing 16 C.F.R. § 436.2(a)). An FDD must contain certain required information about the franchisor and the business being franchised, *see* 16 C.F.R. § 436.5, and "[a]ll information in the disclosure document" must "be current as of the close of the franchisor's most recent fiscal year." 16 C.F.R. § 436.7(a).

Frost Shades is a franchisor whose franchisees "sell[] and install[] residential window tinting, commercial window tinting, decorative and designer window films, and privacy and security films" under the "Frost Shades" brand. (Doc. No. 1 ¶ 9.) It is organized as a Tennessee limited liability company that, at the time this litigation commenced, had three members: defendant Goldberger, who lives in New Jersey; defendant Swanson, who lives in New York;

and nonparty Thomas J. Scott, who lives in Tennessee.[1] (*Id.* ¶¶ 2–5; Doc. No. 15 at 3.) The Franchise Rule's disclosure requirements reach beyond the franchisor itself to "the franchisor's directors, trustees, general partners, principal officers, and any other individuals who will have management responsibility relating to the sale or operation of franchises offered." 16 C.F.R. § 436.5. Accordingly, Goldberger, Swanson, and Scott were among the subjects required to be covered by Frost Shades' FDDs for the periods during which they were involved with the company.

The Franchise Rule groups the information required in an FDD into categories numbered Item 1 through Item 23. *See* 16 C.F.R. § 436.5(a)–(w). Item 3 requires the disclosure of certain information regarding the litigation history of the franchisor and covered individuals. *See* 16 C.F.R. § 436.5(c). Goldberger and Swanson were previously involved with another franchisor, Patch Boys Franchising, LLC ("Patch Boys"), which was the subject of several potentially relevant matters: two lawsuits by private plaintiffs in the District of Minnesota (hereinafter, the "*Anderson*" case and "*Borgen*" case); an investigation by the Minnesota Department of Commerce; and an investigation by the Attorney General of New York. (Doc. No. 1 ¶¶ 17–23, 27, 29.) The Minnesota Department of Commerce investigation resulted in a Consent Order "whereby Patch Boys and Goldberger acknowledged that they violated the Minnesota Franchise Act" and "agreed to pay a civil penalty in the amount of $7,500, agreed to refrain from violating any laws, rule or orders in Minnesota, including the Minnesota Franchise Act, and [agreed not to] sell franchises in Minnesota until the Patch Boys' FDD was registered." (*Id.* ¶ 27.) The New York investigation resulted in an "Assurance [of] Discontinuance Pursuant to [N.Y.] Executive Law § 63(12) . . . , wherein Patch Boys and Goldberger acknowledged that they sold franchises

---

[1] A falling out between the defendants and Scott appears to have played a significant role in the events surrounding this lawsuit. The court, however, will focus on the claims actually at issue and will touch on any underlying conflicts only to the extent that they are relevant to contested matters in this case.

without disclosing Goldberger's 1999 felony conviction [for credit card fraud] in Patch Boys' FDD, as required by New York law, and agreed to pay a $10,000 fine." (*Id.* ¶ 29.) The Complaint and supporting materials provide less detail about the conclusion of the two private Minnesota lawsuits, but they confirm that Goldberger and Swanson were named defendants in both. (*Id.* ¶¶ 18, 21; Doc. Nos. 1-5, 1-6.) The Complaint asserts that details of all of those matters—as well as an additional lawsuit against Goldberger involving bad checks—should have been included in Frost Shades' standard FDD.[2] (Doc. No. 1 ¶¶ 30–40.) Instead, the FDD included only the following:

**Item 3**
**LITIGATION**

No litigation is required to be disclosed in this Item.

(Doc. No. 29-1 at 3.) Lunt entered into a franchise agreement with Frost Shades in what he says was reliance on the allegedly deficient FDD, and he was granted a Frost Shades territory in upper South Carolina. (Doc. No. 1 ¶¶ 30, 51; Doc. No. 29 ¶¶ 4, 7–8.)

Not long thereafter, however, the parties' relationship broke down. One of the factors that led to tension between the parties, according to Lunt, was that Frost Shades "provided little, if any, of the support that it was supposed to provide." (Doc. No. 29 ¶ 10(a).) For example, Lunt states that he "was never given a 'Brand Standards Manual' or access to any 'Brand Standards' as the FDD stated [he] would be provided," nor was he given promised technical specifications. (*Id.*) Lunt states that the training and onsite support he received were inadequate and that, as a result, he "essentially had to learn how to properly specify window tinting and otherwise run [his] franchise business on [his] own." (*Id.*) Meanwhile, "as a result of a dispute between the

---

[2] The defendants assert that Swanson was not yet a member of Frost Shades when Lunt purchased his franchise. Goldberger, however, was.

owners of" Frost Shades, Lunt became aware of the history that had not been disclosed in the FDD. (*Id.* ¶ 6.)

On October 2, 2022, Lunt filed a Complaint in this court, asserting claims against Frost Shades, Goldberger, and Swanson. (Doc. No. 1.) The Complaint purports to assert three counts. Counts One and Two are each for fraudulent inducement to contract, with Count One focusing on affirmative misrepresentations and Count Two focusing on fraudulent concealment. (*Id.* ¶¶ 59–71.) The Complaint characterizes Count Three as a claim for "injunctive relief," which is a remedy, not a cause of action. *See Goryoka v. Quicken Loan, Inc.*, 519 F. App'x 926, 929 (6th Cir. 2013). One of the paragraphs in Count III, however, describes the request as "pursuant to" a section of the Tennessee Consumer Protection Act, so the court will construe Count III as asserting a claim pursuant to that statute.[3] (*Id.* ¶¶ 72–76.) Lunt seeks both restitution and rescission of all agreements between him and Frost Shades. (*Id.* at 20–21.)

On November 18, 2022, the defendants filed a Motion (Doc. No. 11), asking the court to compel Lunt to submit his claims to arbitration pursuant to the parties' franchise agreement, which included the following provisions:

**17.1 Arbitration.**

(a) <u>Disputes Subject to Arbitration</u>. Except as expressly provided in subsection (c) and (d), any controversy or claim between the parties (including any controversy or claim arising out of or relating to this Agreement or its formation, and including any question of arbitrability) shall be resolved by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, including the Optional Rules for Emergency Measures of Protection. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction.

---

[3] The confusion regarding what claims Lunt is actually seeking to pursue has continued into his briefing, in which he makes some arguments—such as those involving breach of contract or the enforceability of particular contractual provisions—that do not appear to be fairly encompassed by the claims stated in his actual Complaint.

(b) <u>Location</u>. The place of arbitration shall be the city and state where Frost Shades' headquarters are located.

(c) <u>Injunctive Relief</u>. Either party may apply to the arbitrator seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. Either party also may, without waiving any remedy or right to arbitrate under this Agreement, seek from any court having jurisdiction any interim or provisional injunctive relief.

(Doc. No. 1-2 at 27.) In the alternative, the defendants ask the court to require Lunt to add Scott as an indispensable party, in accordance with Rule 19 of the Federal Rules of Civil Procedure. (Doc. No. 11 at 1.)

On February 6, 2011, Lunt filed a Motion for Preliminary Injunction asking the court to enter an order enjoining the defendants from "(a) enforcing the noncompetition provisions of the January 28, 2021 Franchise Agreement . . . and the related Guaranty and Noncompetition Agreement; and (b) otherwise interfering with [Lunt's] operation of or engagement in a window tinting business." (Doc. No. 27 at 1.) The noncompetition provisions of the franchise agreement read as follows:

**13.2 Covenants Not to Compete**

(a) <u>Restriction - In Term</u>. During the term of this Agreement, neither Franchisee, any Owner, nor any spouse of an Owner (the "<u>Restricted Parties</u>") shall directly or indirectly have any ownership interest in, lend money or provide financial assistance to, provide any services to, or be employed by, any Competitor.

(b) <u>Restriction - Post Term</u>. For two years after this Agreement expires or is terminated for any reason (or, if applicable, for two years after a Transfer), no Restricted Party shall directly or indirectly have any ownership interest in, lend money or provide financial assistance to, provide any services to, or be employed by, any Competitor operating in any of Franchisee's Territory or the territory of any other Frost Shades business operating on the date of termination or transfer, as applicable.

(c) <u>Interpretation</u>. The parties agree that each of the foregoing covenants is independent of any other covenant or provision of this Agreement. If all or any portion of the covenants in this Section is held to be unenforceable or unreasonable by any court or arbitrator, then the parties intend that the court or

7

arbitrator modify such restriction to the extent reasonably necessary to protect the legitimate business interests of Frost Shades. Franchisee agrees that the existence of any claim it may have against Frost Shades shall not constitute a defense to the enforcement by Frost Shades of the covenants of this Section. If a Restricted Party fails to comply with the obligations under this Section during the restrictive period, then the restrictive period will be extended an additional day for each day of noncompliance.

(Doc. No. 1-2 at 21.) The separate guaranty agreement, which is designated as an attachment to the franchise agreement, contains essentially the same provisions. (Doc. No. 1-3 at 34.)

Lunt has provided a Declaration explaining that, in late 2022, Frost Shades informed him that it considered him in default of his franchise agreement due to unpaid royalties and effectively ended the parties' relationship.[4] (Doc. No. 29 ¶¶ 11–14.) He states that he has "recently been approached by a large, international manufacturer of window film and many other products with the possibility of representing their window product line." (*Id.* ¶ 15.) Lunt, however, cannot pursue that opportunity unless he is relieved of his obligations pursuant to the noncompetition provisions.

## II. LEGAL STANDARD

### A. Motion to Compel Arbitration

The question of whether the plaintiff's claims must be arbitrated is governed by the Federal Arbitration Act ("FAA"). The FAA provides that a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist in law or in equity for the revocation of any contract." 9 U.S.C. § 2. There is a "strong presumption" in favor of arbitration under the FAA. *Huffman v. Hilltop Companies, LLC*, 747 F.3d 391, 393 (6th Cir. 2014). "[A]ny doubts regarding arbitrability should be resolved in favor of arbitration." *Fazio v. Lehman Bros.*, 340 F.3d 386, 392 (6th Cir. 2003) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,

---

[4] Frost Shades disputes that characterization, but, because neither party has filed a claim for breach of contract or any other cause of action related to the performance, rather than formation, of the franchise agreement, the details are not relevant to the court's analysis.

460 U.S. 1, 24–25 (1983)). Where a litigant establishes the existence of a valid agreement to arbitrate the dispute at issue, the court must grant the litigant's motion to compel arbitration and stay or dismiss proceedings until the completion of arbitration. *Glazer v. Lehman Bros., Inc.*, (citing 9 U.S.C. §§ 3–4). The party opposing arbitration has the burden to prove that there is a "genuine issue of material fact as to the validity of the agreement to arbitrate." *Brubaker v. Barrett*, 801 F. Supp. 2d 743, 750 (E.D. Tenn. 2011) (quoting *Great Earth Cos., Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002)).

## B. Motion for Preliminary Injunction

"Four factors determine when a court should grant a preliminary injunction: (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019) (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018); Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948 (3d ed. & Supp. 2019)). The district court must "weigh the strength of the four [preliminary injunction] factors against one another," with the qualification that irreparable harm is an "indispensable" requirement, without which there is "no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T.*, 942 F.3d at 327 (citing *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). Similarly, "a finding that there is simply no likelihood of success on the merits is usually fatal" to a request for preliminary injunctive relief. *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)).

## A. Motion to Compel Arbitration

Lunt, relying on citations to some older state cases, argues that his claims are not subject to arbitration because Tennessee law categorically prohibits the arbitration of fraudulent inducement claims. (Doc. No. 25 at 3–6 (citing *Frizzell Const. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 86 (Tenn. 1999); *Whisenant v. Bill Heard Chevrolet, Inc.*, No. W2004-01745-COA-R3CV, 2005 WL 1629991, at *3–4 (Tenn. Ct. App. July 12, 2005); *City of Blaine v. John Coleman Hayes & Assocs., Inc.*, 818 S.W.2d 33, 38 (Tenn. Ct. App. 1991)).) The defendants dispute that Tennessee law applies in this case, noting that the franchise agreement includes a choice of law provision selecting New Jersey law to govern any litigation between the parties. (Doc. No. 1-2 at 29.) Lunt suggests that the agreement mentions New Jersey rather than Tennessee due to a clerical error, although there is no direct evidence of that. Lunt also argues that, if the court concludes that the provision really was intended to select New Jersey law, then the court should consider that choice of law an impermissible one, due to the lack of a connection between New Jersey and the underlying transaction.

Ultimately, though, the question of which state's laws govern the contract generally is beside the point with regard to the Motion to Compel Arbitration, because the FAA and the terms of the contract dictate the scope of the arbitration provision, not the substantive law of any state. Although there was a time when the caselaw was somewhat unsettled on these issues, it is now well-established that, "[w]hen state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341 (2011) (citing *Preston v. Ferrer*, 552 U.S. 346, 353 (2008)). Indeed, the Tennessee Supreme Court itself has recognized that, "if the parties

agreed to arbitrate the claim of fraudulent inducement, then despite such a prohibition under Tennessee law, the claim must be submitted to arbitration." *Taylor v. Butler*, 142 S.W.3d 277, 283 (Tenn. 2004).

Although Lunt first flatly asserts that "Tennessee law provides that fraudulent inducement claims cannot be arbitrated," he ultimately concedes that "later decisions" have acknowledged that such claims may be arbitrable in at least some situations. (Doc. No. 25 at 4–5.) Lunt argues, however, that that is only the case if the agreement at issue specifically cites the FAA, thereby signaling the parties' intent to rely on federal principles of what may be arbitrated. (*Id.*)

Lunt's focus on the intent of the parties is well-founded, but his theory of how that intent should be determined is inconsistent with the law. It is true that parties "may limit by contract the issues which they will arbitrate," *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989), and that parties therefore could choose to exclude fraudulent inducement claims from arbitration by, for example, expressly stating that they intend to exclude from arbitration any cause of action that has historically been held to be non-arbitrable under Tennessee state law. In order to set forth a rule like that, however, the parties would have to actually express such an intent—not simply fail to cite the FAA expressly. Indeed, the Supreme Court has specifically rejected the argument that, simply because a contract is governed by the laws of a particular state, the court should construe an arbitration provision in that contract to exclude claims that would be non-arbitrable under the laws of that state, but for the FAA. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 60 (1995). The argument for importing older, displaced Tennessee rules based on the expressed intent of the parties is particularly unconvincing in this instance, given that the Tennessee choice of law

11

provision on which Lunt seeks to rely does not actually exist, but is, rather, a creature of pure speculation that the actual contractual terms at issue directly contradict.

There is, moreover, no requirement that a contract invoke the FAA by name in order for the statute to govern. To the contrary, the FAA comes into play any time a party seeking to compel arbitration over the objection of an opposing party establishes "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, [and] (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce." *Parker v. Resurgent Cap. Servs. LP*, No. 4:19-CV-50-BO, 2019 WL 4643745, at *1 (E.D.N.C. Sept. 23, 2019) (citing *Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 84 (4th Cir. 2016)). All of those prerequisites exist here, and nothing in the franchise agreement actually reflects a meeting of the minds to exclude fraudulent inducement claims from arbitration. The court, accordingly, will compel arbitration.

The FAA instructs that, "upon being satisfied that the issue involved in [a] suit or proceeding is referable to arbitration," the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. Lunt has made a request that the court stay, rather than dismiss, his claims, and so that is what the court will do. Consistently with the language of the arbitration provision itself, the stay will include an exception for any request for preliminary injunctive relief.

**B. Motion for Preliminary Injunction**

<u>1. Likelihood of Success on the Merits</u>

The defendants argue that Lunt is unlikely to succeed on the merits because he is unlikely to establish that the Frost Shades FDD was materially false or misleading in any respect on which Lunt reasonably relied to his detriment. In particular, the defendants argue that few, if any, of the facts that Lunt has highlighted as having been improperly omitted from the FDD were actually required to be included and that, insofar as the FDD included limited inadvertent omissions, they are insufficient to support a fraud claim.

### a. Choice of law and the elements of fraudulent inducement

As a preliminary matter, the parties dispute which state's laws should govern the underlying claims. The franchise agreement states that "[t]he laws of the state of New Jersey (without giving effect to its principles of conflicts of law)" shall "govern all adversarial proceedings between the parties," and the defendants urge the court to apply that provision as written. (Doc. No. 1-2 at 29.) Lunt, however—contradicting the position he took in opposition to the Motion to Compel Arbitration—argues that the parties' dispute should be governed by the laws of two states, neither of which is his previously-stated preference of Tennessee: Georgia, for the purpose of interpreting the contract, and South Carolina, for the purpose of the claims of fraudulent inducement.

Typically, when a federal court hears a diversity action, "the law of the forum state, including the choice-of-law rules, appl[ies]." *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009) (citing *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 302 (6th Cir. 2008)). This court therefore must apply Tennessee's rule that a contract is typically "presumed to be governed by the law of the jurisdiction in which it was executed" but that the parties can overcome that

13

presumption by manifesting "a contrary intent." *Vantage Tech v. Cross*, 17 S.W. 3d 637, 650 (Tenn. Ct. App. 1999) (citing *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973)). The clearest and simplest way to manifest that contrary intent is by including an express choice of law provision. *Id.* The franchise agreement, as the court has already discussed, includes a choice of law provision that selects New Jersey law to apply to all disputes between the parties, not merely disputes based on the terms of the contract itself.

Under Tennessee choice of law principles, when parties manifest an intent to apply the law of another jurisdiction by adopting a choice of law provision, then that intent will be honored—if certain requirements are met. *Id.* Specifically, "[t]he choice of law provision must be executed in good faith, the chosen jurisdiction must bear a material connection to the transaction, the basis for the jurisdiction must be reasonable and not a sham, and, finally, the choice of the jurisdiction must not be contrary to the fundamental policy of a state having a materially greater interest and whose law would otherwise govern." *Sw. Tex. Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 672 n.8 (6th Cir. 2006).

Lunt argues that the court cannot enforce the choice of law provision because there was "no material connection between New Jersey and the transaction." (Doc. No. 28 at 14.) As the defendants point out, however, that is not true. Goldberger—an owner and founder of Frost Shades, as well as its CEO—lives in New Jersey. Indeed, while Frost Shades was headquartered in Tennessee when Lunt signed his franchise agreement in early 2021, Goldberger has provided a Declaration, explaining that the company moved to New Jersey in the summer of 2022. (Doc. No. 36-1 ¶ 6.) Although the court assesses New Jersey's connection to the franchise agreement when the agreement was executed, the later move is confirmation that the connection to New Jersey through Goldberger was anything but incidental.

Lunt argues that the Tennessee Court of Appeals has suggested, at least implicitly, that the citizenship of a member of an LLC is not, in and of itself, sufficient to support a choice of law provision. *See Blackwell v. Sky High Sports Nashville Operations, LLC*, 523 S.W.3d 624, 628 (Tenn. Ct. App. 2017). Even if that is so, however, Goldberger's role was not merely as a formal member of the LLC. To the contrary, the entire premise of Lunt's case is that Goldberger was so central to the operations of Frost Shades that Goldberger's history—even his decades-old criminal history—rendered the prospect of doing business with Frost Shades untenable for Lunt. The evidence in the record, moreover, confirms that Goldberger's involvement was extensive and central to the company's operation. The court accordingly finds the choice of law provision to be enforceable as a general matter.

That conclusion, however, does not necessarily resolve the question of which state's laws should govern a fraudulent inducement claim that is premised on the argument that the entire contract—including the choice of law provision—was procured by fraud. As the court has already held, federal law displaces state law on such questions as applied to arbitration clauses. The choice of law clause, however, is not an arbitration clause and therefore not subject to the FAA in its own right. Accordingly, the caselaw on which Lunt was unable to rely in the context of arbitration may still provide an argument here. *See Webb v. First Tennessee Brokerage, Inc.*, No. E2012-00934-COA-R3CV, 2013 WL 3941782, at *16 (Tenn. Ct. App. June 18, 2013) (discussing treatment of choice of law provisions in the context of fraudulent inducement and other "contract formation issues") (quoting *Frizzell Constr. Co.*, 9 S.W.3d at 85).

Ultimately, though, it is unnecessary to consider such arguments, because no party has identified any way in which the relevant states' laws disagree on this particular issue. New Jersey law recognizes a cause of action for fraudulent inducement of contract, governed by the ordinary

15

common-law elements of fraud, pursuant to which "a plaintiff must show: '(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.'" *Furey v. Leonard Buck Tr.*, No. A-2242-20, 2022 WL 2838831, at *16 (N.J. Super. Ct. App. Div. July 21, 2022) (quoting *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (1997)). Materially, the same blackletter principles apply to such claims under South Carolina law as well. *Brown v. Stewart*, 557 S.E.2d 676, 680 (S.C. Ct. App. 2001) (citing *Parker v. Shecut*, 531 S.E.2d 546, 558 (S.C. Ct. App. 2000)). The outcome of this issue therefore does not depend on whether there is an exception to the choice of law provision available for fraudulent inducement claims.

### b. Falsity and knowledge

Under ordinary fraud principles, "silence" on a fact may form the basis of a finding of fraud, if, as "a matter of law," the defendant had a "duty to disclose" the fact that was withheld. *United Jersey Bank v. Kensey*, 704 A.2d 38, 43 (App. Div. 1997) (citing *Strawn v. Canuso*, 657 A.2d 420, 426 (1995)); *see also Harrell v. BMW of N. Am., LLC*, 517 F. Supp. 3d 527, 539 (D.S.C. 2021) ("Under South Carolina law, '[n]on-disclosure is fraudulent when there is a duty to speak.'") (quoting *Regions Bank v. Schmauch*, 582 S.E.2d 432, 445 (S.C. Ct. App. 2003)). Accordingly, the federal duty to make certain disclosures in an FDD may form part of the foundation of a state fraud claim—not because the state cause of action actually "enforces" the federal Franchise Rule, but because the Franchise Rule, like any binding disclosure obligation, changes the landscape of which omissions can be considered false or misleading. *See TC Tech Mgt. Co. v. Ceeks on Call Am., Inc.*, No. 2:03-CV-714-RAJ, 2004 WL 5154906, at *5 (E.D. Va. Mar. 24, 2004).

The Franchise Rule's litigation disclosure provisions do not require a franchisor to disclose every lawsuit or threatened lawsuit in which it or its principals have ever been implicated. Rather, it requires the disclosure of certain qualifying litigation if it occurred during a particular window of time—the previous ten years for the most serious disclosures, and the "last fiscal year" for others. Among the matters that must be disclosed is whether the franchisor or a qualifying individual "[w]as a party to any material civil action involving the franchise relationship in the last fiscal year," 16 C.F.R. § 436.5(c)(1)(ii), and whether there are any pending "[c]ivil actions, other than ordinary routine litigation incidental to the business, which are material in the context of the number of franchisees and the size, nature, or financial condition of the franchise system or its business operations," 16 C.F.R. § 436.5(c)(1)(i)(B).[5]

The defendants admit that Frost Shades "inadvertently" omitted the *Borgen* case, which was still pending when Lunt entered into the franchise agreement. (Doc. No. 36 at 3.) Goldberger now explains that "[t]his error occurred because the [*Borgen*] litigation was filed after [Swanson and Goldberger] had sold [their] interests in" Patch Boys. (Doc. No. 36-1 ¶ 10.) Even if that is true, however, Goldberger and Swanson were named defendants in that suit, and they have not identified any legal argument that would support concluding that disclosure was not required. Goldberger and Swanson were also named parties in the *Anderson* case, which had concluded less than a year prior to the issuance of the FDD—and, while the defendants have not expressly conceded that a failure to disclose *Anderson* was "error," they have not advanced any particular legal argument, supported by citation to law, for why omitting it was permissible.

---

[5] The defendants later updated the Frost Shades FDD to include several of the previously omitted facts, which Lunt repeatedly urges the court to treat as some kind of smoking gun, proving that the disclosures had been required all along. Nothing about choosing to disclose a fact, however, necessarily constitutes an admission that the disclosure was required. To the contrary, the theories of liability at issue in this case are a good example of why a franchisor might wish to err on the side of disclosure.

With regard to the Minnesota Consent Order—which was likely subject to the Franchise Rule's requirement to disclose active injunctions, which the court will discuss in more detail shortly—the defendants argue that it "is directly part and parcel of the *Anderson* and *Borgen* cases and is not a separate and distinct litigation that needed to be disclosed." (Doc. No. 36 at 10.) That argument might carry some weight if the *Anderson* and *Borgen* cases had been disclosed, but, given that they were not, the defendants' position is little more than a gloss placed on the admission that the Consent Order should have been disclosed in some way—either in isolation or through a broader disclosure—but was not. In fact, the defendants' position that the disclosure of one Minnesota matter would have been the equivalent of a disclosure of all Minnesota matters works better, in this case, as an argument for the severity of the FDD's defects, not against it. The defendants' concession that the *Anderson* case, *Borgen* case, and Minnesota Attorney General investigation were all, in some sense, a unitary matter is also a concession that the one nondisclosure that the defendants conceded was erroneous—the *Borgen* case—was effectively a failure to disclose all three. Even if one did, for example, interpret "last fiscal year" in a way that would make the *Anderson* case exempt from *separate* disclosure, the defendants' own position is that disclosure of the *Borgen* case would have effectively been disclosure of the state investigation and settlement, which—again, according to the defendants themselves—would have directly implicated *Anderson*.

The defendants' argument regarding the New York Assurance of Discontinuance is no more convincing. They argue that that agreement "did not need to be disclosed" because it "specifically related to the New York Franchise Sales Act . . . , not the FTC regulations, and, as such, it was not required to be disclosed pursuant to the FTC regulations." (Doc. No. 36 at 9–10.) The Franchise Rule itself, however, unambiguously rejects that distinction as significant. A

franchisor or qualifying individual must disclose if it is "subject to a currently effective injunctive or restrictive order or decree resulting from a pending or concluded action brought by a public agency and relating to the franchise or to a Federal, State, or Canadian franchise, securities, antitrust, trade regulation, or trade practice law." 16 C.F.R. § 436.5(c)(2). Goldberger was a named party to the Assurance of Discontinuance, and, while the $10,000 fine appears to have been formally assessed against Patch Boys as the violator, the Assurance of Discontinuance imposes payment obligations on the "Respondents," a phrase that included Goldberger. (Doc. No. 28-5 ¶ 12.) Moreover, by entering into an assurance of discontinuance, Goldberger waived certain rights to contest liability if he violated the obligations set forth in the agreement. *See* N.Y. Exec. Law § 63(15) ("Evidence of a violation of such assurance shall constitute prima facie proof of violation of the applicable law in any civil action or proceeding thereafter commenced by the attorney general."). There is, accordingly, a strong argument that the New York settlement, as well, was required to be disclosed.[6]

The same facts that support a finding of material falsity support an inference that the defendants were aware that they had improperly omitted items from the FDD and that they committed those omissions for the purpose of inducing Lunt's reliance. Goldberger was an experienced franchisor who should have been well aware of the Franchise Rule and the role of FDDs, and he was a party to the undisclosed matters. Goldberger's experience, moreover, gave Frost Shades ample reason to understand why a potential franchisee would expect to receive, and

---

[6] The parties disagree regarding whether the other civil case, involving Goldberger's involvement with bad checks, was actually pending within the time period that would have made it subject to disclosure. In light of the unresolved questions involving this aspect of the FDD, the court will not rely on this allegation in its analysis. Similarly, the court will not rely on allegations that Frost Shades misrepresented the extent or quality of its franchise support, on the ground that the record is still too undeveloped to make a firm prediction about the success of those allegations.

then rely on, information about past litigation involving the franchisors with whom he might be working.

### c. Reliance

The defendants argue that, even if Frost Shades may have failed to include some facts in its FDD, it "substantially complied" with its obligations. (Doc. No. 36 at 6.) This, though, is not an enforcement action by the FTC, but rather a private action for fraud. The relevant question, then, is not whether Frost Windows is likely to clear some abstract bar of "substantial compliance"—which, frankly, strikes the court as unlikely—but whether Lunt is likely to establish that he reasonably relied on Frost Shades' omissions of mandatory information. On that topic, Lunt has provided a Declaration stating the following:

> If any of the items discussed . . . had been disclosed in the FDD, I would never have even considered the purchase of a [Frost Shades] franchise. One of the reasons I ultimately decided to move forward with [Frost Shades] was the lack of any disclosures. For example, if the New York Assurance [of] Discontinuance had been disclosed, I would have learned that: (a) Mr. Goldberger, who was the President and CEO of Patch Boys, had been convicted of federal felony credit card fraud and conspiracy to commit credit card fraud; and (b) Mr. Goldberger had concealed these convictions in a previous FDD. Had I known these things, I would have never agreed to purchase a [Frost Shades] franchise. . . . Similarly, had I known that Mr. Goldberger and Mr. Swanson had been sued twice within a year for fraud in connection with franchise sales and failing to disclose items on [an] FDD, I would not have purchased a [Frost Shades] franchise. . . . Since knowledge of any of the items that the Defendants concealed from me in the FDD would have substantially impacted my decision to purchase a [Frost Shades] franchise, knowledge of two or more of them would have had even more of an impact.

(Doc. No. 29 ¶¶ 7–9.) Lunt explains that he purchased the franchise with the assistance of a franchise broker who explained both the nature and the importance of the FDD process, which specifically led him to rely on the FDD in his decisionmaking. (*Id.* ¶ 5.)

Lunt's account is plausible. That does not mean that it is necessarily accurate, of course. Discovery might reveal that Lunt was so dead set on opening a window film franchise under the

Frost Shades brand that no number of red flags could have dissuaded him. At this stage, however, the court is not called on to resolve these questions definitively, but merely to determine whether Lunt has a likelihood of success on the merits. On the question of whether he actually and reasonably relied on the FDD's omissions, the Declaration is sufficient to establish that he did.

### d. Damages

Finally, the defendants argue that Lunt cannot show that he suffered any damages due to his having been allegedly induced into becoming a Frost Shades franchisee. Lunt, however, has provided evidence that Frost Shades' poor support of him as a franchisee—which could have been avoided simply by working with a more reputable and competent franchisor—cost him money. More broadly, it is undeniable that the franchise agreement significantly restricts Lunt's rights to engage in the window film industry, at least for a period of time. That restriction on his ordinary right to contract and do business is itself a form of injury. The court accordingly finds that Lunt has established a significant likelihood of success with regard to each of the elements of a claim for fraudulent inducement to contract. This factor favors Lunt.

### 2. Irreparable Harm

Lunt asserts that he is suffering irreparable harm due to his inability to pursue other opportunities that would violate the noncompetition provision of the franchise agreement. He states that he is in "danger of losing the substantial amount of time and money that [he has] invested in [his] window tinting business," presumably because he cannot afford to simply freeze that business in place while he waits for litigation to release him from the noncompetition obligation that, he says, he was defrauded into accepting. (Doc. No. 29 ¶ 14.) He also claims to

be in specific talks with a window film manufacturer that have had to be put on hold due to that obligation.

"Monetary or economic harm by itself" typically "does not constitute irreparable harm," because injuries that are purely monetary in character can be remedied at the end of litigation by money damages. *Green v. Bauer*, No. 1:08-CV-249, 2009 WL 88609, at *1 (S.D. Ohio Jan. 12, 2009) (citing *State of Ohio ex rel. Celebrezze v. N.R.C.*, 812 F.2d 288, 290 (6th Cir. 1987)). As Lunt has pointed out, however, his claims are only incidentally about the money that he has lost. Rather, they are about his right to operate his business in the field of his choosing. The actual value of that right is, at this point, unknowable; it may turn out that the market has little long-term interest in buying window film from Lunt, whether under the Frost Shades brand or otherwise. The only evidence before the court, however, suggests that, if Lunt is prevented from building his business for too long, the opportunity will pass him by. For example, another entity, unencumbered by a Frost Shades noncompetition provision, could come to dominate the territory while Lunt waits, or he might lose the personal goodwill with customers that he has amassed so far. Lunt's showing of irreparable harm is not overwhelming, but it is sufficient to support an award of preliminary relief.

### 3. Balance of Equities/Public Interest

The only harm that the defendants will suffer if the preliminary injunction is granted is that Lunt will be able to compete against Frost Shades immediately. While some harm might come from that, it is not a worse harm than Lunt would suffer from having the noncompetition provision wrongly enforced against him. To the contrary, Frost Shades would remain entirely capable of selling window film franchises anywhere it complied with state franchising laws, including South Carolina, and would, at most, simply miss out on some business that went to

22

Lunt instead. A failure to grant the motion, in contrast, would amount to locking Lunt out of the industry unless he was willing to serve as a franchisee for the company that, he has plausibly alleged, defrauded him. Although each option includes risks, the equities favor Lunt.

The same is true of the public interest. Generally speaking, the public interest "disfavor[s] restraints on trade and interference with a person's livelihood," unless there is some sufficient reason for those restraints. *Mktg. Displays Int'l v. Shaw*, No. 22-CV-12287, 2022 WL 17725484, at *7 (E.D. Mich. Dec. 14, 2022) (quoting *Superior Consulting Co. v. Walling*, 851 F. Supp. 839, 848 (E.D. Mich. 1994)). The general public interest in the enforcement of contracts can support enforcement of valid noncompetition agreements, *see id.*, but that argument simply brings the court back to the merits—which favor Lunt.

The defendants complain that, if Lunt is permitted to enter the window film industry on his own behalf, he will improperly benefit from expertise and training that Frost Shades provided him. Lunt, however, has presented evidence suggesting that the training he received from Frost Shades was markedly deficient and that he mainly had to train himself. In any event, the prospect of Lunt's benefiting from any skills he picked up while working with Frost Shades is only problematic insofar as Lunt is subject to an enforceable noncompetition agreement. Otherwise, Lunt is just like every other entrepreneur: free to use his miscellaneous skills and experience— including skills and experience he obtained in past ventures—to build a new operation. The record before the court suggests that Lunt has a significant likelihood of establishing that he is not subject to a lawfully obtained and enforceable noncompetition provision, because he accepted that provision in reliance on a fraudulent FDD. The court accordingly concludes that each preliminary injunction factor favors granting Lunt preliminary relief.

### 4. Scope of Injunction/Bond

Lunt asks the court to enjoin the defendants from "(a) enforcing the noncompetition provisions of the January 28, 2021 Franchise Agreement . . . and the related Guaranty and Noncompetition Agreement; [or] (b) otherwise interfering with Plaintiff's operation of or engagement in a window tinting business." (Doc. No. 27 at 1.) The first of those requests is self-explanatory and will be granted. Lunt's request to rely on the judicial power of this court to keep him free from "interference" in his business, however, is unsupported. Certainly, Frost Shades may not "unlawfully" interfere in Lunt's business, and there is no need for an injunction to memorialize that fact. But when it comes to any other form of "interference," Frost Shades has every right to engage in ordinary business competition, just as Lunt does. A vague prohibition on "interference" would place an unnecessary and difficult-to-construe restriction on Frost Shades' right to treat Lunt like an ordinary competitor—which is exactly what he wants to be. The court accordingly will not grant Lunt's second request.

This court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Neither party has taken a position regarding the amount of security necessary in this case. As the court has noted, the extent of harm that the defendants would suffer in the event of an improperly granted preliminary injunction is speculative, and the defendants have provided little, if any, evidence that would allow the court to quantify it with any reliable precision. Such harm is nevertheless a meaningful possibility. The court, based on its review of the record and experience in prior cases, concludes that a $500 bond will be sufficient.

**IV. CONCLUSION**

For the foregoing reasons, the defendants' Motion to Dismiss and Compel Arbitration or, In the Alternative, Motion to Join an Indispensable Party (Doc. No. 13) will be granted in part and denied in part, and Lunt will be ordered to submit his claims to arbitration. Proceedings in this case will be stayed, with the exception of proceedings incident to Lunt's Motion for Preliminary Injunction (Doc. No. 27), which will also be granted in part and denied in part.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge